**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**UNITED STATES OF AMERICA,**

**v.** **Criminal No. 3:26cr40**

**BRYAN EUGENE BROOKE,**

**Defendant.**

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant Bryan Brooke's Motion to Suppress (the "Motion to Suppress" or "Motion"). (ECF No. 34.)[1] In the Motion, Mr. Brooke moves to suppress records obtained by agents of the Federal Bureau of Investigation ("FBI") through administrative subpoenas and search warrants relying on the products of those subpoenas under the Fourth Amendment to the United States Constitution. (ECF No. 34, at 1.)

On July 22, 2026, Mr. Brooke filed the Motion. (ECF No. 34.) The United States responded, (ECF No. 37), and Mr. Brooke replied, (ECF No. 40). On August 14, 2026, the Court held a hearing concerning Mr. Brooke's Motion. (ECF No. 35.) This matter is ripe for disposition. For the reasons articulated below, the Court will deny the Motion.

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A. Factual Findings[2]

#### 1. An Undercover Agent of the Federal Bureau of Investigation Messages a User on Kik Named "KCDomBull"

In November 2023,[3] an undercover agent (the "UCA") with the FBI Field Officer in Richmond, Virginia, maintained an investigative profile on the communication platform "Kik." (ECF No. 37, at 1.) The UCA's Kik profile was a member of public groups in which Kik users discussed sex with minor children. (ECF No. 34, at 1; ECF No. 37, at 1.) The UCA received a message from another member of these groups under the name "KCDomBull." (ECF No. 34, at 1; ECF No. 37, at 1.) KCDomBull's profile picture on Kik was a photo of Mr. Brooke. (ECF No. 34, at 2; ECF No. 37, at 1.)

The UCA posed as the father of a teenage daughter and offered this fictitious daughter to Kik users for sex. (ECF No. 34, at 2.) KCDomBull asked the UCA about his fictitious daughter, and the UCA explained that his "daughter" was 13 years old. (ECF No. 37, at 2.) KCDomBull asked the UCA whether the UCA allowed others to have sex with his daughter, and the UCA responded that he would "rent" her out to others to engage in sexual activity. (ECF No. 37, at 2.) KCDomBull then asked the UCA to move their conversation to the communication platform "Session," to which the UCA agreed. (ECF No. 34, at 1; ECF No. 37, at 2.)

[2] The court bases its factual determinations on the exhibits attached to Mr. Brooke's Motion, (ECF Nos. 34-1, 34-2, 34-3, 34-4, 34-5, 34-6), and the parties' briefing. During the August 14, 2026 hearing, the parties represented that no disagreements about the underlying factual circumstances exist.

[3] Mr. Brooke asserts that the investigation began in "December 2023." (ECF No. 34, at 1.) The precise date on which the investigation began is not material to the Court's decision.

During their interactions on Session, KCDomBull sent the UCA nine video files depicting child pornography. (ECF No. 34, at 2; ECF No. 37, at 2.) KCDomBull also explained to the UCA that he was interested in traveling to Richmond, Virginia, where the UCA allegedly lived, to "rent out" the UCA's fictitious daughter. (ECF No. 37, at 2.) After the UCA agreed to "rent out" his daughter, KCDomBull explained to the UCA that he was booking flights to and from Richmond, and the parties agreed on a rate to "rent out" the UCA's daughter. (ECF No. 37, at 2.) KCDomBull messaged the UCA that he had purchased a plane ticket to Richmond and sent the UCA a photo of the ticket. (ECF No. 37, at 3.) Shortly after sending this photo, KCDomBull stopped communicating with the UCA and never traveled to Richmond. (ECF No. 34, at 2; ECF No. 37, at 3.)

### 2. Using Information on Kik and the Messages from KCDomBull, FBI Agents Identify KCDomBull as Mr. Brooke

In December 2023, an officer of the Kansas City, Missouri Police Department investigated the KCDomBull Kik profile and found additional images of the individual in the profile's photo. (ECF No. 37, at 3.) Agents with the FBI's Field Office in Kansas City, Missouri further investigated the KCDomBull account and determined that the individual in its profile photo was Mr. Brooke. (ECF No. 34, at 2; ECF No. 37, at 3.) These agents then conducted an interview of Mr. Brooke at his residence, where he acknowledged that he was the individual in the KCDomBull profile photo. (ECF No. 37, at 3.) During that interview, Mr. Brooke confirmed his phone number and email address. (ECF No. 37, at 3.) The FBI agents then used investigative tools to expose otherwise redacted information from the flight itinerary sent by KCDomBull to reveal the last four digits of the credit or debit card used to purchase the flight and the cost of that flight. (ECF No. 37, at 3.)

### 3. FBI Agents Obtain Mr. Brooke's Flight, Financial, and Phone Subscriber Records Through Administrative Subpoenas

In 2024, Special Agent Michael Harrison of the FBI's Kansas City Field Office issued administrative subpoenas to Southwest Airlines ("Southwest"), Discover Financial Services ("Discover"), and T-Mobile for information concerning Mr. Brooke. (ECF No. 34, at 2.) Special Agent Harrison issued these administrative subpoenas relying on 18 U.S.C. § 3486(a)(1)(A)(i)(II).[4] (ECF No. 34, at 2.) Each of these subpoenas contained the following assertion: "The information sought through this subpoena relates to a federal criminal investigation being conducted by the FBI." (ECF No. 34, at 3 (capitalization omitted).) The subpoenas sought:

> Customer or subscriber name, address of service, and billing address; Length of service (including start date and end date); Local and long distance telephone connection records (examples include: incoming and outgoing calls, push-to-talk, and SMS/MMS connection records); Means and source of payment (including any credit card or bank account number); Records of session times and duration for

---

[4] 18 U.S.C. § 3486(a)(1) provides, in relevant part:

> (a) Authorization.—
>
> (1)
>
> (A) In any investigation of—
>
> (i)
>
> * * *
>
> (II) a Federal offense involving the sexual exploitation or abuse of children, the Attorney General
>
> * * *
>
> may issue in writing and cause to be served a subpoena requiring the production and testimony described in [18 U.S.C. § 3486(a)(1)(B)].
>
> (B) Except as provided in subparagraph (C), a subpoena issued under subparagraph (A) may require—
>
> (i) the production of any records or other things relevant to the investigation[.]

18 U.S.C. §§ 3486(a)(1)(A)–(B).

> Internet connectivity; Telephone or Instrument number (including IMEI, IMSI, UFMI, and ESN) and/or other customer/subscriber number(s) used to identify customer/subscriber, including any temporarily assigned network address (including Internet Protocol addresses); Types of service used (e.g. push-to-talk, text, three-way calling, email services, cloud computing, gaming services, etc.).

(ECF No. 34, at 3.)

On April 23, 2024,[5] Special Agent Harrison served an administrative subpoena on Discover. (ECF No. 34, at 4; ECF No. 34-4, at 4.) The Discover subpoena sought, without a specified time limit:

> All records pertaining to [Mr. Brooke as identified by name, address, social security number, and date of birth] and accounts whether held jointly or severally or as trustee or fiduciary as well as custodian, or guardian as well as any other entity in which these individuals or entities may have a financial interest and or signatory authority. To include all accounts in which these individuals or business have signatory authority and/or the right of withdrawal.

(ECF No. 34-3, at 4.) Discover ultimately produced information responsive to this subpoena. (*See generally* ECF No. 34-4.) The Discover records showed a purchase for $682.96 from "SW AIR DALLAS TX." (ECF No. 34-4, at 126.)

On May 22, 2024,[6] Special Agent Harrison served an administrative subpoena with this language on Southwest for "the period 2023-12-06". (ECF No. 34, at 3; ECF No. 34-1, at 1.)

---

[5] Mr. Brooke asserts that Special Agent Harrison served the subpoena on Discover on May 22, 2024. (ECF No. 34, at 4.) But Mr. Brooke attaches to his Motion an email from Special Agent Harrison serving the subpoena on Discover dated April 23, 2024. (ECF No. 34-4, at 5.) The exact days on which the subpoena was issued or served is not material to this decision.

[6] Mr. Brooke asserts that Special Agent Harrison served this subpoena on Southwest on April 23, 2024. (ECF No. 34, at 3.) Attached to Mr. Brooke's Motion is an email, dated April 23, 2024, from Special Agent Harrison to Discover attaching the administrative subpoena for Discover's review. (ECF No. 34-4, at 4.) But the subpoena itself states that it was "[i]ssued" on May 22, 2024. (ECF No. 34-1, at 1.) The precise days on which the subpoena was issued or served again is not material to this decision.

The subpoena specified that the requested records "may be relevant to an authorized law enforcement inquiry, involving . . . [a] Southwest Airline ticket purchase that occurred on December 6, 2023 in the amount of '$682.96'" associated with a particular Discover credit card. (ECF No. 34-1, at 1, 4.) Southwest ultimately produced this information, which contained a travel itinerary for a passenger under the name "Bryan Brooke" from Kansas City, Missouri to Richmond, Virginia in December 2023. (*See generally* ECF No. 34-2.)

On June 1, 2024, Special Agent Harrison served an administrative subpoena on T-Mobile, seeking subscriber information associated with a telephone number ending in "8839," which number had been referenced in the records produced by Discover. (ECF No. 34, at 5.)

When obtaining records from Discover, Southwest, and T-Mobile, the agents did not obtain warrants supported by probable cause determinations. Rather, they relied solely on the administrative subpoenas authorized by 18 U.S.C. § 3486(a)(1)(A)(i)(II).

Relying on the information produced in response to the three administrative subpoenas, Special Agent Harrison applied for and obtained a search warrant from a United States Magistrate Judge for the Western District of Missouri for Mr. Brooke's email account. (ECF No. 34-5.) Special Agent Harrison received that approved search warrant on July 12, 2024. (ECF No. 34, at 5.)

On March 8, 2026, the United States arrested Mr. Brooke at his home in Missouri and recovered a variety of devices, including phones, laptops, and tablets. (ECF No. 34, at 5.) Relying on the information produced in response to the three administrative subpoenas, Special Agent Harrison applied for and obtained a search warrant from a United States Magistrate Judge for the Western District of Missouri to search the recovered devices. (ECF No. 34-6.)

### B. **Procedural Background**

On February 2, 2026, the United States charged Mr. Brooke via a Criminal Information with one count of Distribution of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). (*United States v. Brooke*, No. 26-cr-13 (MHL), ECF No. 1 (E.D. Va. Feb. 2, 2026) ("*Brooke I*")). The Court scheduled an arraignment and plea hearing for Mr. Brooke to take place on March 3, 2026. (*Brooke I*, ECF No. 7.) Mr. Brooke did not appear for the hearing, which the Court continued. On March 6, 2026, the United States moved to dismiss the Criminal Information, explaining that Mr. Brooke "no longer intend[ed] to enter a guilty plea," meaning "prosecution of [the case] via criminal information [was] not viable." (*Brooke I*, ECF No. 9, at 1.) The Court granted the United States' motion to dismiss the Criminal Information. (*Brooke I*, ECF No. 10.)

On that same day, the United States charged Mr. Brooke in the present matter via a Criminal Complaint with one count of Distribution of Child Pornography in in violation of 18 U.S.C. § 2252A(a)(2)(A). (ECF No. 3.) On April 7, 2026, a Grand Jury for the Eastern District of Virginia returned a one-Count Indictment charging Mr. Brooke with one Count of Distribution of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). (ECF No. 8.) On April 22, 2026, Mr. Brooke appeared before United States Magistrate Judge Mark R. Colombell for an initial appearance and detention hearing. (ECF No. 15.) On April 30, 2026, Mr. Brooke appeared before this Court for an arraignment and scheduled this matter for trial beginning August 3, 2026. (ECF No. 19.)

On June 9, 2026, Mr. Brooke moved to continue the trial date. (ECF No. 24.) On June 18, 2026, the Court held a status conference on the motion to continue. (ECF No. 26.) During that hearing, the parties explained that given the voluminous discovery in this matter, they were not yet sure which dates would be appropriate for trial. Accordingly, the Court took the motion

to continue under advisement and scheduled another status conference for July 7, 2026. (ECF No. 27.)

During the subsequent July 7, 2026 status conference, the Court scheduled trial to begin December 1, 2026, declared this matter complex within the meaning of the Speedy Trial Act,[7] and scheduled a motions hearing for August 14, 2026. (ECF Nos. 29, 30, 31, 32.)

On July 22, 2026, Mr. Brooke filed the instant Motion to Suppress. (ECF No. 34). The United States responded, (ECF No. 37), and Mr. Brooke replied, (ECF No. 40). On August 14, 2026, the Court held a hearing on the Motion. (ECF No. 35.)

---

[7] The Speedy Trial Act, which can be found at 18 U.S.C. § 3161, requires that the Court commence trial within seventy days of filing date of the indictment or the defendant's initial appearance, whichever occur later. § 3161(c)(1). However, § 3161(h) provides, in relevant part, that:

> (h) The following periods of delay shall be excluded . . . in computing the time within which the trial of any such offense must commence:
>
> * * *
>
> (7)
>
> (A) Any period of delay resulting from a continuance granted . . . on the basis . . . that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. . . .
>
> (B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:
>
> * * *
>
> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

§§ 3161(h)(7)(A)–(B).

## **II. Standard of Review**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular description of the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (internal brackets omitted) (quoting U.S. Const. amend. IV). Evidence seized pursuant to an invalid warrant is ordinarily suppressed under the exclusionary rule, meaning that the evidence "cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (quotation omitted).

However, the United States Supreme Court "recognized a good faith exception to that rule, under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

"The proponent of a motion to suppress has the burden of establishing that his [or her] own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Bowman*, 106 F.4th 293, 300 (4th Cir. 2024) ("[T]he defendant bears the burden of proof on a motion to suppress."). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III. Analysis

Mr. Brooke moves the Court to suppress the evidence culled from the administrative subpoenas and search warrant used by law enforcement investigators. (ECF No. 34, at 1.) According to Mr. Brooke, the Supreme Court's decisions in *Carpenter v. United States,* 585 U.S. 296, 308 (2018) and *Chatrie v. United States*, 146 S. Ct. 2193, 2212 (2026) have vitiated the third-party doctrine on which the administrative subpoenas rely. The United States responds that the third-party doctrine remains good law even after *Carpenter* and *Chatrie*, and that even if these cases did not apply, the good-faith exception to the exclusionary rule would.

The Court will deny the Motion to Suppress. Law enforcement obtained Mr. Brooke's records through administrative subpoenas duly authorized by statute. And the records law enforcement obtained are exactly the type covered by the third-party doctrine such that Special Agent Harrison was under no obligation to obtain a warrant for these records first. Mr. Brooke concedes as much, in that he "acknowledges that [his] constitutional claim is currently foreclosed by binding precedent from the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit, particularly with respect to the 'third party doctrine.'" (ECF No. 34, at 1.) The Court will therefore deny the Motion.

### A. The Court Will Deny the Motion Because the Third-Party Doctrine Covers the Records Obtained Through the Administrative Subpoenas

Mr. Brooke argues that the Supreme Court's decisions in *Carpenter* and *Chatrie* have nullified the third-party doctrine, under which law enforcement need not obtain a warrant to search records voluntarily disclosed by a defendant to a third party. The Court disagrees. *Carpenter* and *Chatrie* expressly did not touch standing precedent applying the third-party doctrine to the type of records obtained by law enforcement in this case. And even if the third-

party doctrine did not cover these records, the good-faith exception to the exclusionary rule would apply and bar suppression here. The Court must therefore deny the Motion.

### 1. Legal Standard: The Third-Party Doctrine

"The touchstone of Fourth Amendment analysis is whether the individual has a reasonable expectation of privacy in the area searched." *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010) (quotations omitted). "In order to demonstrate a legitimate expectation of privacy, [a defendant] must have a subjective expectation of privacy, and . . . that subjective expectation must be reasonable." *Id.* (quotation omitted). The Supreme Court has long explained that "a person has no legitimate expectation of privacy in information he [or she] voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979). "That remains true 'even if the information is revealed on the assumption that it will be used only for a limited purpose.'" *Carpenter v. United States*, 585 U.S. 296, 308 (2018) (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)). Under this "third-party doctrine," law enforcement need not obtain a warrant before seeking information from a third party to whom a defendant has voluntarily disclosed their information.

The third-party doctrine "traces to two cases involving information provided by customers to a bank and telephone company, and then turned over to law enforcement officials." *Chatrie*, 146 S. Ct. at 2212. In *United States v. Miller*, the Supreme Court "held that a bank depositor had no reasonable expectation of privacy in canceled checks and deposit slips in his bank's possession, because the records were 'voluntarily conveyed to the bank[] and exposed to [its] employees in the ordinary course of business.'" *Id.* (quoting *Miller*, 425 U.S. at 442). And in *Smith v. Maryland*, the Supreme Court "applied that principle to hold that a (landline) telephone subscriber lacked a legitimate expectation of privacy in the phone numbers he dialed"

because the subscriber "had 'voluntarily conveyed [the dialed numbers] to the telephone company,' and so relinquished his Fourth Amendment right." *Id.* (quoting *Smith*, 442 U.S. at 744).

In two later-decided cases, the Supreme Court has clarified the reach of the third-party doctrine. First, in *Carpenter*, the Supreme Court determined that the third-party doctrine did not apply to cell-site location information ("CSLI"), a record of a cell phone's location capturing "not just dialed digits, but a detailed and comprehensive record of the [phone user's] movements." 585 U.S. at 309. Recognizing the "seismic shifts in digital technology that made possible the tracking of [an individual's] location," the *Carpenter* court refused to extend the third-party doctrine to CSLI because "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up," rendering the sharing of this information involuntary. *Id.* at 315. Importantly, the Supreme Court noted that the decision in *Carpenter* was "a narrow one," in that it "d[id] not disturb the application of *Smith* and *Miller*." *Id.* at 316.

Second, in *Chatrie v. United States*, the Supreme Court again refused to extend the third-party doctrine to a Google user's "Location History . . . which records the location of a user's cell phone every two minutes or so." 146 S. Ct. at 2199. Using this detailed location data, law enforcement applied for a "geofence" warrant to gather information about every cell phone in a broad swath of geographic area "located in the vicinity of a crime scene at around the time the crime was committed" in order to "find out who was there and so who might have done it." *Id.* at 2201. The *Chatrie* court concluded that, like CSLI in *Carpenter*, a user's Location History "enables officials to undertake nearly perfect, retrospective surveillance of countless persons and places" even though this information was shared with a third party "merely . . . when a user

avails himself [or herself] of one of the services on his [or her] cell phone." *Id.* at 2213. These searches can involve thousands of cell phone users employing a myriad of applications. Accordingly, the Supreme Court found that the logic of *Smith* and *Miller* did not apply. Like *Carpenter*, however, *Chatrie* did not overrule *Smith* or *Miller*.

### 2. The Supreme Court's Decision in *Miller* Renders the United States' Administrative Subpoena for Mr. Brooke's Discover Records Proper

The Court will not suppress the products of the administrative subpoena served on Discover. These records, indicating Mr. Brooke's purchases and account balances over time, (*see* ECF No. 34-4), are precisely the type of records subject to the third-party doctrine as outlined in *Miller*. And as *Carpenter* expressly recognized, 585 U.S. at 316, *Miller's* holding that the third-party doctrine applies to bank records voluntarily disclosed by a defendant continues to govern this matter.

Mr. Brooke contends that an individual's banking records are no different than the CSLI considered in *Carpenter* or the Location History considered in *Chatrie*:

> It is virtually impossible to participate in even the most basic modern commerce without a bank account and debit or credit card. Against that backdrop, the use of debit or credit cards and attendant provision of information to the card issuer can hardly be characterized as more "voluntary" than information provided to a cellular phone provider via use of a cell phone.

(ECF No. 34, at 10 (citing *Chatrie*, 2026 WL 1855568, at *20).) But courts in this District have recognized that bank records *are* distinct from CSLI or Location History. "While CSLI is generated automatically whenever a person turns on her cell phone, [an individual's] bank records [are] generated whenever [he or] she chose to use [his or] her bank cards to initiate a purchase, overtly requesting that the bank engage in the transfer of funds." *United States v. Ogunwale*, No. 1:24-cr-165 (MSN), 2025 WL 2463681, at *16 (E.D. Va. Aug. 26, 2025).

Because the Court must adhere to the ruling of *Miller* and because the reasoning of *Carpenter* and *Chatrie* do not apply, the Court will not suppress Mr. Brooke's Discover records.

### 3. **Mr. Brooke Withdrew His Challenge to the United States' <u>Administrative Subpoena for Mr. Brooke's T-Mobile Records</u>**

In his Motion, Mr. Brooke challenged the propriety of all of the United States' administrative subpoenas, including the administrative subpoena seeking Mr. Brooke's T-Mobile records. Mr. Brooke explained that, at the time he filed his Motion, he had "been unable to find [the T-Mobile administrative subpoena] or the responsive material in the discovery provided by the government." (ECF No. 34, at 2 n.1.) As a seeming precaution, Mr. Brooke challenged the United States' use of an administrative subpoena to acquire those records. (ECF No. 34, at 11 (moving the Court for suppression of "*all* evidence gathered pursuant to the administrative subpoenas") (emphasis added).) However, in his reply, Mr. Brooke explains that after filing his Motion, the United States "provided him with a copy of the subpoena and the materials T-Mobile provided in response to the subpoena." (ECF No. 40, at 1.)

Those materials contained "subscriber information and what appears to be cell-site location information (CSLI)." (ECF No. 40, at 1.) The United States represented to Mr. Brooke that it does not intend to introduce those materials at trial, and Mr. Brooke "will not object to introduction of subscriber information." (ECF No. 40, at 1.) As a result, Mr. Brooke asserts that "information provided in response to the T-Mobile subpoena is no longer the subject of Mr. Brooke's [M]otion to [S]uppress." (ECF No. 40.) Accordingly, the Court will recognize Mr. Brooke's withdrawal of his claims concerning the T-Mobile records and will not suppress the use of subscriber information in Mr. Brooke's T-Mobile records.

#### 4. *Miller* Also Supports the Propriety of the United States' Administrative Subpoena for Mr. Brooke's Southwest Records

The Court will also decline to suppress Mr. Brooke's Southwest records. While neither *Smith* nor *Miller* concerned a defendant's voluntary disclosure of flight records, the third-party doctrine applies with equal force to such records. Indeed, an individual's purchase of an airline ticket, and the subsequent creation of a business record by the airline selling that ticket, is akin to the creation of bank records as in *Miller*. *See United States v. Turner*, No. 3:24-cr-8, 2025 WL 1939591, at *8 (W.D. Va. July 15, 2025) ("The information that the Defendant conveyed to the Priceline website to secure hotel reservations are 'business records' like the bank records in *Miller*."). And courts around the country have recognized that flight purchase records are subject to the third-party doctrine. *See United States v. Brooks*, 841 F. App'x 346, 350 (3d Cir. 2020) ("[T]here is no reasonable expectation of privacy in telephone subscriber information and records or flight and ticketing information."); *United States v. Goree*, 47 F. App'x 706, 712 (6th Cir. 2002) ("All of the information that Goree objects to was provided by him to the airline. Therefore, Goree lacks any 'reasonable expectation of privacy' in his flight information."). Accordingly, the Court will adhere to the ruling of *Miller* and decline to suppress Mr. Brooke's Southwest records.

#### 5. Because the Third-Party Doctrine Covers the Records Obtained Through the Administrative Subpoenas, the Court Sees No Constitutional Deficiency in the Search Warrants Relying Upon the Information Derived from those Subpoenas

Special Agent Harrison relied upon the information returned in response to the administrative subpoenas when seeking search warrants for Mr. Brooke's email records and his devices. (ECF Nos. 34-5, 34-6.) Because the Court concludes that the third-party doctrine covers the agents' administrative subpoenas, the Court sees no constitutional deficiency in the

search warrant applications that relied upon the products of those subpoenas. Accordingly, the Court will not suppress the results of the search warrants for Mr. Brooke's email records or his devices.

### 6. **The Court Is Not Bound by Justice Gorsuch's Concurrence in *Chatrie***

Mr. Brooke insists that the third-party doctrine "as articulated in *Miller* and *Smith* is impossible to square with the holdings in *Carpenter* and *Chatrie*." (ECF No. 34, at 9.) But *Carpenter* and *Chatrie* expressly left *Miller* and *Smith* intact. Courts have consistently applied *Miller* and *Smith* to information voluntarily disclosed by defendants even after *Carpenter*. To be sure, *Carpenter* and *Chatrie* demonstrate that the Supreme Court continues to grapple with the applicability of the third-party doctrine to developing technologies. But when courts have considered the applicability of the third-party doctrine, the animating force behind challenges to the doctrine is technology that engages in consistent and pervasive *location monitoring*. *See, e.g.*, *Schmidt v. City of Norfolk*, 819 F. Supp. 3d 492, 504–17 (E.D. Va. 2026) (rejecting plaintiff's Fourth Amendment challenge to Flock cameras' consistent collection of location images because these cameras did not gather as pervasive of information as the CSLI in *Carpenter*); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (refusing to apply third-party doctrine to mass-surveillance system that tracked "every movement" of individuals). No similar concern exists here, where Mr. Brooke challenges the applicability of the third-party doctrine to the kind of records long contemplated by that doctrine.

Still, Mr. Brooke contends that the Court should ignore this existing precedent to apply the formulation of the Fourth Amendment promoted by Justice Gorsuch in his solo concurrence in *Chatrie*, and "find that the information obtained via the administrative subpoenas were, at a minimum, Mr. Brooke's 'effects' under the Fourth Amendment, as they qualify as personal

property." (ECF No. 34, at 11 (citing *Chatrie*, 146 S. Ct. at 2220 (Gorsuch, J., concurring)).) In this concurrence, Justice Gorsuch explained that he would not apply the "reasonable expectation of privacy" test to the use of Location History: "To decide whether the Fourth Amendment is in play, I would consult its terms, asking first whether Location History qualifies as one of Mr. Chatrie's papers or effects, and then asking whether the government searched those papers or effects." *Chatrie*, 146 S. Ct. at 2220 (Gorsuch, J., concurring)). Justice Gorsuch added that the Fourth Amendment's use of the term "effects" "embrace[s] most any kind of personal property." *Id.* (citation omitted).

But Justice Gorsuch's concurrence is not binding on this Court, nor was it persuasive to any member of the *Chatrie* majority. Rather, the Court will continue to apply longstanding law articulated in the *Chatrie* majority and in other cases to conclude that the third-party doctrine covers each of Mr. Brooke's records obtained through administrative subpoenas. The Court will therefore deny the Motion to Suppress.

### B. The Good-Faith Exception to the Exclusionary Rule Would Also Support the United States' Collection of Mr. Brooke's Records

#### 1. Legal Standard: The Good-faith Exception to the Exclusionary Rule

Even if a warrant is not supported by probable cause, "the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citing *Leon*, 468 U.S. at 922–23). "[T]he proper test of an officer's good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting *Leon*, 468 U.S. at 922 n.23).

In *United States v. Leon*, the Supreme Court "explained that an officer could not be found to have acted with 'objective reasonableness,'" *Bynum*, 293 F.3d at 195, thereby barring the application of the good-faith exception, in the following circumstances:

> (1) where the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth";
>
> (2) "where the issuing magistrate wholly abandoned his [or her] judicial role";
>
> (3) where "a warrant based on an affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; or
>
> (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Leon*, 468 U.S. at 923 (citations omitted)).

### 2. Even Presuming Invalid Subpoenas or Search Applications, the Court Would Not Suppress the Records Because None of the *Leon* Exceptions Exist Here

The United States contends that even if Special Agent Harrison should have obtained search warrants for all of the documents involved (rather than administrative subpoenas) the Court should still deny the Motion to Suppress "pursuant to the good-faith exception to the exclusionary rule." (ECF No. 37, at 10.) According to Mr. Brooke, the administrative subpoenas were "facially deficient" in that these subpoenas "were issued with 'cut-and-pasted' language that not only requested cellular telephone records not likely to be in the possession of an airline and credit card company but also failed to specify the records sought." (ECF No. 40, at 2 – 3.) Mr. Brooke asserts that the fourth *Leon* exception bars the agents' good-faith reliance on the administrative subpoenas.

But the fourth *Leon* exception requires the Court to find that the administrative subpoenas were so facially deficient *"in failing to particularize the place to be searched or the things to be*

*seized* . . . that the executing officers [could not] reasonably presume it to be valid." *Leon*, 468 U.S. at 923. The Court cannot so find. While the administrative subpoenas may have requested a large *scope* of records from each organization, that scope does not render the administrative subpoenas *insufficiently particularized*. To the contrary, the administrative subpoenas specified clear categories of evidence to be searched, rendering them sufficiently particularized. Because the administrative subpoenas were not facially deficient, the record demonstrates that, even presuming some information obtained was done so in violation of the Fourth Amendment, the Court would find that law enforcement acted in good-faith reliance on the validity of the administrative subpoenas and that none of the *Leon* exceptions are met.

## IV. Conclusion

For the foregoing reasons, the third-party doctrine applies to the records obtained through the administrative subpoenas and, even if it did not, the good-faith exception to the exclusionary rule would apply. The Court will deny the Motion and will not suppress the records obtained through the administrative subpoenas or the resultant search warrants.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
Chief United States District Judge

Date: 10/26/26
Richmond, Virginia